Plaintiff and defendant signed a written contract on May 6, 1946, wherein the former gave and granted to the latter the right to cut and remove pine timber suitable for poles, of fixed dimensions and at fixed prices, from certain lands owned by it in the Parish of Sabine. Under the terms of the contract the trees to be cut and removed, prior thereto, were to be designated and marked by plaintiff's representative. The contract, in detail, provides the method of operation thereunder, including the checking and measuring of the poles in order to determine the price of each. It was also provided that invoices should be made by plaintiff after each batch of poles was inspected, etc., a copy of which was to be, and, in fact, was delivered to defendant, and upon which he was to make payments. Defendant completed the cutting and removing of all poles designated by plaintiff, in keeping with the contract, in the latter part of June, 1946. At that time he was due to plaintiff on account, reflected from four different invoices, $2,286.53, against which there was a credit of $850 paid by some one who had bought poles from him. This left a balance due to plaintiff of $1,436.53.
On July 2, 1946, defendant gave to plaintiff, in payment of poles described in invoices Nos. 408 and 421, a check for the sum of $1,080.26. This check, however, was dishonored by the bank on which drawn, on July 22nd, for insufficiency of funds to defendant's credit.
About the time defendant had completed work under said contract, he and plaintiff entered into negotiations looking to the formation of another contract of the same tenor and terms that would include other lands of plaintiff in Sabine Parish. They reached common ground, it was thought, on the subject, and in keeping with their agreement, a written instrument, embodying the terms and conditions agreed upon, was drafted by the plaintiff and was handed or forwarded to defendant for his signature. He signed it on July 16th, and returned it to plaintiff with a letter in which he objected to the scale of prices set up therein and, concluding the letter, he said: "I am signing the contract with the understanding that page two thereof will carry the new unit prices."
However, in anticipation of the completion of the proposed contract, plaintiff's representative went upon the land described therein, designated some trees for cutting thereunder and defendant actually cut thereon and removed forty-six of them. About this time knowledge that the check had been dishonored reached plaintiff's office in Winnfield, Louisiana, through its office in Mobile, Alabama, to whom the check had been sent for collection, and plaintiff's representative promptly told defendant to cut no more poles from the land described in the proposed contract, and in addition, in effect, he was informed that the proposed contract was at end. Following this defendant was asked to pay the check above mentioned. He declined and stated he would not do so until and unless plaintiff signed the proposed contract with the change of prices outlined in the mentioned letter, and allowed him to proceed thereunder. Of course, this was not done.
This suit to recover the balance due for trees cut under the executed contract and for the price of the forty-six trees cut thereafter, above mentioned, amounting in all to $1,623.12, was filed on August 16, 1946. In conjunction with the suit a writ of sequestration was sued out under which several piles of poles were seized by the sheriff. Defendant denied liability in any amount to the plaintiff, reconvened and sued for a large amount of damages allegedly sustained by him because of the issuance and levy of the writ, and plaintiff's refusal to sign and go forward with the execution of the mentioned proposed contract.
There was judgment for plaintiff as by it prayed. No mention therein whatever is made of the writ of sequestration. It is not referred to in brief of either side. Presumably, it has passed from the case. Defendant appealed devolutively.
There existed at least two valid reasons in law for plaintiff's refusal to go forward with the proposed contract with defendant, to wit: *Page 679 
[1] 1. Defendant's acceptance and signing of the contract were made expressly on condition that the price schedule therein be revised upward. For this reason, unless and until plaintiff concurred in defendant's position in this respect, the contract, even as to defendant, would not be binding. R. C.C. Articles Nos. 1805 and 1806.
[2] 2. Having failed to pay a large amount of the stumpage price for poles cut and removed under the first contract, plaintiff had the unquestioned right to withhold its signature from the second contract until defendant's obligation under the executed one had been fully discharged. This is the primary reason assigned by plaintiff for not proceeding with the proposed contract.
It appears that after stopping defendant from cutting under the proposed second contract, plaintiff's representative at Winnfield refused to further discuss with him the proposed contract until he had paid in full the balance due on the stumpage price under the executed contract. Defendant Was advised of this position by letter. This was certainly a sound business position to take and was clearly justified under the existing facts. Defendant declined to meet this reasonable demand. It would be unthinkable to require or expect a person to continue business relations with another when that other had so signally violated his obligations under a pre-existing contract of the same tenor and character as that sought to be enforced. To require such action on plaintiff's part would be tantamount to exposing it to the chances of sustaining additional losses. There is on the sheriff's return on the writ a notation that warrants the inference that defendant had sold and delivered to another party the poles prior to levy of the seizure thereon; hence, the impotency of seizure. By such sale, plaintiff lost its lien and privilege on the poles.
In brief, defendant's counsel says: "It is significant that at no time did the defendant refuse to pay the check which was returned some two or three weeks after it was issued. No effort was made by plaintiff to send the check through for collection a second time. On the other hand the defendant at all times held himself out as ready to carry out the contract in every particular. He said that if permitted to proceed with his cutting operations he was ready and willing to pay the check."
[3] The record does not support this statement. At no time after the check was dishonored was there to defendant's credit in the bank on which it was drawn, a sufficient amount to pay it. This fact is clearly shown from the bank's ledger sheet introduced in evidence by defendant himself. The best evidence of the refusal of the drawer of a check to pay it, lies in the fact that his bank account continuously is inadequate to pay it, and his refusal to otherwise honor same after notice of dishonor. Defendant did this. He also, before this suit was tried, closed his account in the bank on which the check was drawn.
It is true, as argued, that defendant, all along, tried to use the dishonored check and his liability to plaintiff as a pry to induce it to sign the proposed contract. This position was as unreasonable as it was unfair.
[4] A check is an unconditional order on the bank to pay to the payee, or his order, the amount written therein. It is an honor obligation, and should always be treated as such. Conditions, we know, do occasionally arise between the time of issuing a check and the time of its presentment for payment, that warrant the drawer in having it dishonored by the bank, but, in this case, no such conditions intervened. To the contrary, defendant actually enriched himself from the issuance of the check. Plaintiff accepted it, of course, as good for its face amount, and did not hurry to present it. This delay, coupled with plaintiff's reliance upon the check, enabled defendant to dispose of the poles to a third person, collect the price and evade payment of the stumpage price due plaintiff.
The judgment appealed from is obviously correct, and, for the reasons herein given, it is affirmed with costs.
 On Application for Rehearing